**UNITED STATES of America,
Plaintiff,**

**v.**

**Harold Latham HATCHEL, Defendant.**

**Crim. A. No. 70–110.**

United States District Court,
D. Massachusetts.

June 30, 1971.

———◆———

Herbert F. Travers, Jr., U. S. Atty., Henry H. Hammond, Asst. U. S. Atty., for plaintiff.

Herbert N. Goodwin, Boston, Mass., for defendant.

## MEMORANDUM

JULIAN, District Judge.

Defendant Harold Latham Hatchel was indicted on two counts for knowingly receiving stolen motor vehicles which were moving as part of interstate commerce. Contending that his constitutional rights were violated, defendant has moved to suppress the following evidence:

1. Documents seized from him by Boston Police Patrolman Edward Johns on August 30, 1969;

2. (a) Statements made by defendant to Patrolman Johns on August 30, 1969; (b) Statements made by defendant to FBI Agent Francis M. Joyce on August 30, 1969; and (c) Statements made by defendant to FBI Agents Francis M. Joyce and Thomas Marquardt on March 26, 1970; and

3. Handwriting samples given by defendant to .FBI agents on March 26, 1970.

## FINDINGS OF FACT

An evidentiary hearing was held on the motion. On the evidence presented at the hearing, I find that the following incidents occurred on August 30, 1969, and on March 26, 1970.

On the afternoon of August 30, 1969, Boston Police Patrolman Edward Johns observed a maroon 1969 Chrysler being driven slowly backward in the wrong direction on Lucerne Street, a one-way street in the Dorchester section of Boston. Patrolman Johns signalled to the driver of the Chrysler, who was the defendant in this case, to stop, but the de-

fendant drove slowly forward on Lucerne Street and turned left into heavy traffic on Morton Street. Patrolman Johns followed in his police car.

Patrolman Johns followed the Chrysler for several blocks through heavy traffic, and when the two cars were on the less congested Willowwood Street, Johns again signalled to defendant to pull over and stop. Defendant parked his car against the right side curb, and Johns parked about twenty feet in front of defendant's car. Leaving their respective cars, Patrolman Johns and defendant met halfway between the cars. The passengers in defendant's car, a woman seated in the front seat and three teen-aged boys seated in the back seat, remained in defendant's car.

Johns told defendant that he had backed up a one-way street and he asked to see defendant's driver's license and registration. Defendant went to his car and then returned with three documents: two registration certificates and an application for transfer of registration. One registration was for a 1969 Chrysler sedan, registered in the name of Annie Hatcher. The second registration was for a 1962 Chrysler sedan registered in the name of Annie Hatcher. The application for transfer of registration was for a 1969 Chrysler and it also listed the car owner as Annie Hatcher. Defendant said he could not seem to find his driver's license. The defendant gave his name as Harold Hatcher, and his address as 55 Codman Park, Roxbury. He spelled his name for Patrolman Johns, "H-A-T-C-H-E-R." Defendant gave his date of birth as December 16, 1932; when Johns asked him a second time for his date of birth, the defendant said it was December 18, 1933.

Johns asked him whose car he was driving, and defendant replied, "My sister's." Johns determined from the documents the defendant had given him that the car defendant was driving was not properly registered and he asked the defendant for an explanation. Defendant said there was a mix-up and that "we're

transferring it back on the other application."

Johns again asked defendant for his driver's license and defendant went back to his car to look for it. Johns also went over to defendant's car, peered through the windshield, and read the serial number printed on the dashboard. As defendant continued to look for his license, Johns went back to his police car, called police headquarters, and asked them to check the serial number of the car. Johns also asked headquarters to send him some help because, he said, "I believed I had an arrest."

Again, Patrolman Johns and defendant met between their cars. Defendant said, "I can't seem to find my license," but he continued to shout to the woman who was seated in the front seat of the Chrysler to "get the licenses."

At this point Patrolman Johns began to feel pressured as defendant continued to advance toward him. Johns pulled his gun, told defendant he was under arrest for driving without a license, and ordered defendant to get into the back seat of the police car. Defendant did so, and Johns placed handcuffs on him.

Patrolman Johns then received word over his police radio that the automobile defendant was driving had been stolen on March 14, 1969. Johns told defendant that the car was stolen, and defendant said that he didn't know anything about it, that the car belonged to his sister, Annie Hatcher, and that he had just borrowed it.

Defendant continued to yell to the woman in the car, a Mrs. Gloria Mallory, to get the licenses. Johns asked defendant who the people in his car were, and the defendant said he didn't actually know, that he had just picked them up and that he was giving them a ride.

When additional police officers arrived, Patrolman Johns advised defendant of his constitutional rights by reading a police "Miranda card" which contained the proper warnings. The defendant said, "I've said all I'm going to

say." He was not questioned further at that time.

Thereafter, defendant was taken to Division 3 of the Boston Police Department, where he was again properly informed of his *Miranda* rights by a desk sergeant. He was fingerprinted and photographed, but not interrogated.

A short time later, FBI Special Agent Francis M. Joyce, having been informed that Patrolman Johns had arrested someone in possession of a car which had been stolen in Pennsylvania, arrived at Division 3. Agent Joyce orally advised defendant of his constitutional rights, and he also handed defendant the Boston Police Department "Miranda card" for defendant to read. Defendant said that he understood his rights but that he was willing to answer questions. No promises, threats, · or any other forms of coercion were utilized to induce defendant to answer questions. Agent Joyce recorded his memory of this conversation with the defendant on FBI Form 302, dated September 5, 1969, marked Exhibit 7 at the hearing on the motion to suppress.

On March 26, 1970, Agent Joyce, in possession of a warrant for the arrest of defendant, and in the company of FBI Special Agent James Scanlon and several other FBI agents, went to the second floor apartment at 20 Theodore Street in the Dorchester section of Boston. Agent Joyce knocked on the door and called out, "Mr. Hatchel!" From inside the apartment the defendant responded, "Who is it?" Joyce replied, "This is the FBI; we have a warrant for your arrest."

"What?" called defendant.

"This is the FBI; open the door. Open the door or I'll have to kick it in."

"Kick it in," defendant called.

No further response was made by defendant, but the agents could hear noises from inside the apartment. After about three minutes had elapsed, the agents broke through the door and arrested the defendant. Joyce told defendant that he was under arrest for receiving an automobile which had been stolen and transported in interstate commerce. Agent Scanlon advised defendant of his constitutional rights.

Defendant was not questioned at 20 Theodore Street; he was taken to the FBI office at the John F. Kennedy Federal Building in Boston. Agent Joyce again orally advised defendant of his constitutional rights and provided defendant with a written advice of rights and waiver of rights form. Defendant signed this waiver of rights form in the presence of Agent Joyce and FBI Special Agent Thomas K. Marquardt.

Agent Joyce asked defendant if he understood the document and defendant said yes. Agent Joyce asked if defendant was willing to be interviewed without an attorney, and defendant said yes. Agents Joyce and Marquardt proceeded to interrogate the defendant. No promises, threats, or any other form of coercion were employed to induce defendant to answer questions. Agent Joyce recorded his memory of this interview with defendant on FBI Form 302, dated March 31, 1970, marked Exhibit 6 at the hearing on the motion to suppress.

After defendant was questioned he was asked to give several handwriting samples. Defendant voluntarily gave the handwriting samples without any form of coercion or inducement being exerted upon him.

## CONCLUSIONS OF LAW

■ 1. There is no basis for suppressing the documents obtained from defendant by Patrolman Johns on August 30, 1969. The evidence shows, and I find, that defendant furnished the two registration certificates in the name of Annie Hatcher and the application for transfer of registration in the name of Annie Hatcher voluntarily when Patrolman Johns asked for defendant's license and registration, as it is customary and reasonable to do when a motorist is stopped for a traffic violation. In this instance the defendant was stopped by Patrolman Johns for driving in a wrong direction on a one-way street.

2. (a) The statements made by defendant to Patrolman Johns must be analyzed in two parts. First, there is no reason to suppress the statements made by defendant before he was arrested. These statements were made in response to general on-the-scene questioning by Patrolman Johns, and they are not rendered inadmissible by the patrolman's failure to give the *Miranda* warnings. Allen v. United States, 1968, 129 U.S.App.D.C. 61, 390 F.2d 476, 479; United States v. Gibson, 1968, 4 Cir., 392 F.2d 373; Lowe v. United States, 1969, 9 Cir., 407 F.2d 1391; United States v. Robertson, 1970, 5 Cir., 425 F. 2d 1386; see Miranda v. Arizona, 1966, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L. Ed.2d 694.

Once Patrolman Johns arrested defendant, however, he should have given defendant the *Miranda* warnings. The line of demarcation between what constitutes general on-the-scene questioning and what constitutes custodial interrogation is not precise, and it necessarily varies from case to case. United States v. Gibson, *supra*. Although Johns realized soon after he examined the registration documents that defendant's car was not properly registered, I find that no compelling atmosphere or coercive influences were brought to bear upon defendant until Johns pulled his gun and arrested the defendant. When defendant was arrested, handcuffed, and put into the police car, the circumstances changed dramatically. Patrolman Johns' subsequent statement to defendant that the car had been ·stolen certainly invited an answer if it did not demand one, and defendant did indeed answer, before he had been properly warned of his rights.

I rule, therefore, that any statements made by the defendant to Patrolman Johns after defendant was arrested must be suppressed. When defendant was given the warnings moments later, he invoked his Fifth Amendment rights, and he was not thereafter questioned by Johns or other Boston policemen.

2. (b) I find that defendant's statements to FBI Agent Joyce on August 26, 1969, were voluntarily made, and therefore they may not be suppressed. The fact that the defendant had invoked his Fifth Amendment privilege when he was arrested on Willowwood Street does not taint this subsequent conversation. The interview with Agent Joyce was separated in time and place from the place of arrest (although Patrolman Johns was present at this subsequent interview). Agent Joyce gave defendant the proper warnings before he questioned him, and I find that defendant knowingly waived his constitutional rights and consented to answer questions. The fact that a defendant has once expressed a desire not to talk does not mean that the authorities are forever barred from attempting to question that defendant. See Miranda v. Arizona, 1966, 384 U.S. 436, 496–497, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2. (c) No grounds exist for suppressing the statements made by defendant to Agents Joyce and Marquardt on March 26, 1970. The agents gave proper notice of their authority and purpose when they knocked at his door, Miller v. United States, 1958, 357 U.S. 301, 78 S. Ct. 1190, 2 L.Ed.2d 1332, and it was reasonable for them to break into the apartment when three minutes had elapsed without defendant opening the door. *Cf.* Jackson v. United States, 1965, 1 Cir., 354 F.2d 980. Before the defendant was questioned on this occasion he was twice warned of his constitutional rights, and defendant signed a waiver of rights form. I find that defendant knowingly and voluntarily consented to answer questions, and, accordingly, any statements he made are admissible against him.

3. There is no basis for suppressing the various handwriting samples defendant gave on March 26, 1970. He gave these samples voluntarily, after he had been properly warned. Further, the taking of handwriting exemplars does not violate the defendant's Fifth

Amendment rights, since handwriting samples are not defendant's "communications." Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. Since the arrest was legal, neither defendant's statements nor the handwriting samples are the fruits of a poisonous tree.

Accordingly, it is ordered that statements made by the defendant to Patrolman Johns after the time defendant was arrested on August 30, 1969 be, and they are hereby, suppressed. As to all other evidence defendant sought to suppress, the defendant's motion to suppress is denied.